**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornucopia Products, LLC,<br><br>                  Plaintiff,<br><br>vs.<br><br>Dyson, Inc. and Dyson, Ltd.,<br><br>                  Defendants. | No. CV 12-00234-PHX-NVW<br><br><u>CONSOLIDATED WITH:</u> |
| Dyson Technology Limited; Dyson, Inc.,<br><br>                  Plaintiffs,<br><br>vs.<br><br>Cornucopia Products, LLC,<br><br>                  Defendant. | No. CV 12-00924-PHX-NVW<br><br>**ORDER** |

Before the Court are the "Dyson Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and Rule 9(b)" (Doc. 19) and "Cornucopia's 12(b)(6) Motion to Dismiss and Alternative 12(f) Motion to Strike" (Doc. 37).  For the reasons stated below, the Court will: (i) deny Cornucopia's motion to dismiss as moot; (ii) deny Cornucopia's alternative motion to strike on its merits; (iii) grant Dyson's motion to dismiss Cornucopia's antitrust and tortious interference claims, in part with prejudice and in part without prejudice; and (iv) deny Dyson's motion as to Cornucopia's declaratory judgment claims.

I.   **LEGAL STANDARD**

To state a claim for relief under Fed. R. Civ. P. 8(a), a plaintiff must make "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  This "short and plain statement" must also be "plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 1950.  A claim is plausible if it contains "[f]actual allegations [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and to permit a reasonable inference that the defendant is liable for the conduct alleged, *Iqbal*, 129 S. Ct. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  Rather, the plaintiff must at least "allege sufficient facts to state the elements of [the relevant] claim." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

In evaluating a motion to dismiss, the Court accepts all of Plaintiffs' plausible factual allegations as true and construes the pleadings in a light most favorable to them. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  The Court generally does not look beyond the complaint, but the Court may take judicial notice of matters of public record, even if not alleged in the complaint.  *Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).

II.   **THE VARIOUS DYSON ENTITIES**

At the outset, certain confusion should be cleared up regarding the various Dyson parties.  Cornucopia has sued Dyson Ltd. (the U.K.-based parent company) and Dyson Inc. (a U.S. subsidiary) based on four of "Dyson's" U.S. patents.  The true owner of the four patents in question, however, is Dyson Technology Ltd.

Cornucopia has not sued Dyson Technology.  However, Dyson Inc. says that it is Dyson Technology's licensee with respect to the four patents.  Further, Dyson Technology (along with Dyson Inc.) is a plaintiff in a countersuit brought against Cornucopia for patent infringement.  By stipulation of the parties, the Court consolidated Dyson's countersuit with Cornucopia's original action.  Thus, all relevant parties are now before the Court, and the Court will treat Cornucopia's complaint as if it named Dyson Technology.

On the current record, it is clear that Dyson Technology applied for and received the patents in question.  However, Cornucopia's allegations potentially implicate all three Dyson entities.  At this stage, it is not possible to separate them.  Thus, all references to "Dyson" below are to the three Dyson companies collectively, unless otherwise noted.

## III.    FACTS

The following facts are drawn from Cornucopia's complaint, as well as matters subject to judicial notice, such as the patents in suit and their file histories.  *See*, *e.g.*, *Coinstar, Inc. v. Coinbank Automated Sys., Inc.*, 998 F. Supp. 1109, 1114 (N.D. Cal. 1998) (taking judicial notice of patents and their file histories).  The facts alleged in Cornucopia's complaint are assumed to be true for purposes of Dyson's motion to dismiss.

### A.    The Japanese Bladeless Fan Patent

In 1981, the Japanese patent office issued patent number S56-167897, which disclosed a "bladeless fan" as follows (according to Cornucopia's translation):

> An electric fan, comprising: a base stand that holds fan blades and a motor that drives the fan blades, and a wind discharge ring with a ring shaped slit that is supported on the base stand, has a hollow shape that receives the wind created by the fan blades from the base stand, and discharges wind therefrom.

(Doc. 1 ¶ 7.)  In relevant part, the Japanese patent depicted its invention through the following figures:

1
2
3
4
5
6
7
8
9



10    Figure 1 depicts a cross-section of the entire fan, which is not truly bladeless.  The
11 lower portion of the apparatus conceals a fan which draws air from underneath the base,
12 as denoted by the arrowed lines surrounding the number 8, and pushes it into what the
13 patent calls — according to Cornucopia's translation — the "wind discharge ring" (item
14 13), where one might expect a traditional fan's blades to be located.  The parties here
15 refer to this ring as a "nozzle."

16    Figure 2 is a cutaway view of the nozzle.  As figure 2 shows, the nozzle is a
17 hollow tube with an annular slit (item 14) — as if one had taken a hose, sliced it open
18 lengthwise, rolled it back into a hose shape with one side of the slice slightly overlapping
19 the other side, and then curled the entire thing into shape of a ring.  As the fan inside the
20 base fills the nozzle with air, the air escapes from the nozzle through the slit (and
21 presumably toward the user), as depicted by the two shorter arrowed lines in figure 2 (and
22 the inward-pointing arrows arranged radially over item 13 in figure 1).

23    The four longer arrowed lines in figure 2 appear to depict air from behind the fan
24 being pulled into the open ring and forward.  According to Cornucopia's translation of
25 the Japanese patent, "'the actual amount of wind [generated by the fan] is much higher
26 than the amount of wind directly discharged from the slit.'"  (Doc. 1 ¶ 12 (bracketed
27 material inserted).)

28

How the fan accomplishes this feat is somewhat in question. Cornucopia's complaint claims that the Japanese fan induces the "Coanda effect." (*See id.*) The Coanda effect is "[t]he tendency of a gas or liquid coming out of a jet to travel close to the wall contour even if the wall's direction of curvature is away from the jet's axis." *McGraw-Hill Dictionary of Scientific and Technical Terms* 416 (6th ed. 2003). The Coanda effect can supposedly "entrain" — grab and pull along — surrounding air, thus increasing the flow of air beyond what is being pushed out of the "jet."

The Coanda effect necessarily requires a curved surface downstream from the "jet" — in this case, downstream from the slit through which air escapes the nozzle. The Japanese patent's figures do not disclose such a surface, nor does Cornucopia quote any text from the Japanese patent regarding the Coanda effect. As far as the figures disclose, it appears that the nozzle and slit are designed to push air both forward and inward, with nothing downstream from the slit. Conceivably, this could create a low-pressure zone within the nozzle, thus pulling air from behind the nozzle forward. However, nothing in the figures discloses the necessary physical shape downstream from the slit to take advantage of the Coanda effect.

**B.   Dyson's Bladeless Fan Patents**

**1.   The '449 Patent: A Bladeless Fan with a "Diffuser"**

In September 2009, Dyson (specifically, Dyson Technology) filed U.S. patent application number 12/560,232, titled simply "fan," a preferred embodiment of which was proposed in these figures (among others):

1
2
3
4
5
6
7
8
9
10



FIG. 1          FIG. 2          FIG. 4

11
12
13
14
15
16

Like the Japanese fan, a bladed fan — an impeller in the preferred embodiment — hides within the base (figure 1, item 18) which draws air from around the base and pushes that air into a hollow nozzle (figures 1 and 2, item 1). The cross-section of the nozzle resembles an upside down airfoil, with the trailing edge of the "wing" pointing in the direction that the fan blows air (figure 4). As the impeller fills the ring casing with air, air escapes out of the ring casing through the forward-facing slit (figure 4, item 38).

17
18
19
20
21
22

Dyson's application proposed one independent claim that is relevant here. That independent claim (claim 1) describes a bladeless fan with, among other features, a "nozzle extending about an axis to define an opening through which air from outside the fan assembly is drawn by the air flow emitted from the mouth [*i.e.*, the slit through which air escapes from the 'nozzle']." (FH449 at 19.)[1] This appears to describe the same effect

23
24
25
26
27
28

---

[1] This section contains citations to the file histories of Dyson's patents. These file histories are thousands of pages long, and the Court granted leave for Dyson to file them as PDFs on a CD-ROM, rather than on CM/ECF. Given that, the Court cannot cite to the file histories using a CM/ECF document and page number. In addition, although each patent's file history is contained within its own PDF, none of these PDFs is consecutively paginated from beginning to end (*e.g.*, with Bates numbers). Citations are therefore formatted as in this example, "FH449 at 19" — where "FH" represents "file history"; "449" is the last three digits of the patent number (in this case, U.S. Patent No. 7,931,449); and "19" represents the nineteenth page in the PDF submitted on CD-ROM,

as claimed in the Japanese patent, although it is not clear whether Dyson is relying on lower air pressure, the Coanda effect, or both.  The proposed specification (not the claims) describes a preferred embodiment that includes a Coanda surface (FH449 at 9) — which is the curve sloping away from the direction in which air escaping the slit would most naturally travel (figure 4, item 14).

Claim 1 also described "a diffuser portion tapering away from" the mouth (*id*.), referring to the angles formed by figure 4, items 38, 46, 48, 50, 52, 54, 56, and 58 in relation to each other and in relation to the nozzle's axis (figure 1, item x), leading to the inverted airfoil shape.  In apparent contrast to the Japanese patent's tube-shaped nozzle, the airfoil shape supposedly focuses, smoothes, and accelerates the airflow emerging from the slit.

Dyson included a copy of the Japanese patent with this application.  Dyson also included an English translation of that patent's abstract, which read as follows:

> PURPOSE: To improve the safety and stableness of the fan by providing an air discharging ring shaped in a hollow cylinder form to receive an air stream produced by vanes and having an annular slit to discharge the received airstream therethrough.
>
> CONSTITUTION: The air around a base 1 is suctioned thereinto by the rotation of the vanes 5 of the fan, and then sent upward within the base 1 to a neck piece 10, where it is divided into two air discharging ports 12 so that it can flow within the air discharging ring 13.  The air flowing [within?] the air discharging ring 13 is then discharged through the annular slit 14.  In this instance, the slit 14 is designed to be so narrow as to provide a strong air stream.  Such a strong air stream can stir the air with in the air discharging ring 13 and as a result of this, the air is sensed to flow out of the entire space surrounded by the air discharging ring 13.

(*Id*. at 57; *see also* Doc. 20-1 at 76.)

---

regardless of whether that page displays some other page number.

The Japanese patent came up elsewhere in the application as well.  For example, Dyson included the international search report that resulted from its counterpart international application (filed under the Patent Cooperation Treaty the previous month).  The report cited the Japanese patent and described it as "the most relevant state of the art with regard to" Dyson's proposed claim 1.  The report noted that the only material difference between the invention disclosed in the Japanese patent and Dyson's invention was the "diffuser portion" that supposedly focuses and evens out airflow coming from the nozzle.  The report concluded that the diffuser "is merely one of several straightforward possibilities from which the skilled person would select" to improve the fan's "cooling effect," and therefore "[did] not involve an inventive step."  (FH449 at 85; *see also* Doc. 20-1 at 82.)

Finally, Dyson mentioned the Japanese patent in the background section of its proposed specification:

> Other types of fan are described in US 2,488,467, US 2,433,795, and JP 56-167897.  The fan of US 2,433,795 has spiral slots in a rotating shroud instead of fan blades.  The circulator fan disclosed in US 2,488,467 emits airflow from a series of nozzles and has a large base including a motor and a blower or fan for creating the air flow.

(FH449 at 5.)

The Patent Office approved Dyson's application in April 2011, issuing it as U.S. Patent No. 7,931,449.  All of the proposed language quoted above from the application ended up in the issued patent.

### 2.    The '166 Patent: Adding "Spacers"

In November 2009, Dyson filed patent application number 12/622,844, again titled "fan."  This application largely resembled that which became the '449 patent, but focused primarily on adding small tabs, called "spacers," to the nozzle, as depicted by the features labeled 26, 260, 266, and 360 in these figures:



FIG. 4



FIG. 5

Dyson asserted that these spacers "even the output of air flow" and ensure "that a user should not experience a variation in the intensity of the air flow over time due to product aging or a variation from one fan assembly to another fan assembly due to variations in manufacture." (FH166 at 7.)

This application proposed two independent claims: one describing the entire fan assembly, and the other describing just the "nozzle," but both calling for "spacers." Echoing the '449 patent, both claims also called for a "nozzle defining an opening through which air from outside the fan assembly is drawn by the air flow emitted from the mouth." (*Id*. at 22, 24.) Unlike the '449 patent, this application contained a separate, dependent claim explicitly based on the Coanda effect, calling for "a Coanda surface located adjacent to the [slit] and over which the [slit] is arranged to direct the air flow" (*id*. at 24) — *i.e.*, item 14 of figure 4.

This application, like the application for '449 patent, disclosed the Japanese patent in full with an English translation of its abstract. (*Id*. at 38.) And mimicking the '449 patent almost verbatim, the background section of this application's proposed specification contained the following mention of the Japanese patent:

> Other types of fan or circulator are described in US 2,488,467, US 2,433,795, and JP 56-167897. The fan of US 2,433,795 has spiral slots in a rotating shroud instead of fan

1
2

> blades. The circulator fan disclosed in US 2,488,467 emits
> airflow from a series of nozzles and has a large base including
> a motor and a blower or fan for creating the air flow.

3

(*Id*. at 6.)

4
5
6
7
8

At one point the application process, the patent examiner tentatively rejected most of Dyson's application in light of the Japanese patent and a U.S. patent not relevant here. (*Id*. at 148.) Nonetheless, the Patent Office ultimately approved this application, issuing it as U.S. Patent No. 8,092,166 in January 2012. All of the proposed language quoted above from the application ended up in the issued patent.

9

### 3. The '111 Patent: Adding a "Flexible Sealing Member"

10
11
12
13
14
15
16
17
18
19
20
21

In March 2010, Dyson filed patent application number 12/715,076, titled "fan assembly." This application somewhat resembled that which became the '449 patent, but focused primarily on the impeller inside the fan base, rather than the shape of the nozzle. The proposed patent's single independent claim discloses a "flexible sealing member" (FH111 at 61) which prevents air pushed by the impeller into the nozzle from flowing back into the impeller or the fan base. A dependent claim, echoing the '449 patent, adds the possibility that "the nozzle extends about an axis to define an opening through which air from outside the fan assembly is drawn by the air flow emitted from the mouth." (*Id*. at 62.) Additional dependent claims add the possibility that "the nozzle comprises a Coanda surface located adjacent the mouth and over which the mouth is arranged to direct the air flow" and "the nozzle comprises a diffuser located downstream of the Coanda surface." (*Id*. at 63.)

22
23
24

Like the application for '449 patent, this application disclosed the Japanese patent in full with an English translation of its abstract. (*Id*. at 148.) The proposed specification also contained the following discussion of the Japanese patent:

25
26
27
28

> Some fans, sometimes known as air circulators, generate a
> cooling flow of air without the use of rotating blades. Fans
> such as those described in US 2,488,467 and JP 56-167897
> have large base body portions including a motor and an

> impeller for generating an air flow in the base body.  The air flow is channeled from the base body to an air discharge slot from which the air flow is projected forward towards a user. The fan of US 2,488,467 emits airflow from a series of concentric slots, whereas the fan of JP 56-167897 channels the airflow to a neck piece leading to a single air discharging slot.

(*Id*. at 40.)

The Patent Office approved this application in July 2011, issuing it as U.S. Patent No. 7,972,111.  All of the proposed language quoted above from the application ended up in the issued patent.

### 4.       The '379 Patent: Adding the Ability to Tilt Without Toppling

In March 2010, Dyson filed patent application number 12/716,613, titled "fan assembly."   This device generally resembled that of the '449 patent, but focused primarily on the fan's ability to tilt the "nozzle" upwards and downwards while keeping the fan's center of gravity in the same place — thus preventing the titled fan from being less stable than a fully upright fan.  Its independent claims, as amended, nonetheless called for a "nozzle extending about an opening through which air from outside the nozzle is drawn by the air flow emitted from the mouth [of the nozzle]."  (FH379 at 1360, 1362.)

Like Dyson's previous applications, this application disclosed the Japanese patent in full with an English translation of its abstract.  (FH379 at 146.)  Unlike the previous applications, Dyson's proposed specification contained no discussion of the Japanese patent.

The Patent Office approved this application in November 2011, issuing it as U.S. Patent No. 8,052,379.  All of the proposed language quoted above from the application ended up in the issued patent.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.     Cornucopia's Allegations

Cornucopia, in its complaint, claims that Dyson began selling bladeless fans in the United States in October 2009,[2] and Dyson's bladeless fans were the only bladeless fans available in U.S. retail stores until Cornucopia entered the market in January 2012.

In Dyson's preliminary injunction papers, Dyson says that it saw the Cornucopia bladeless fan for the first time a few weeks after Cornucopia filed this lawsuit in February 2012.  (Doc. 33 at 6.)  But according to Cornucopia, even before its fan came on the market, Dyson "made specific threats to Cornucopia's customers (bladeless fan retailers) and suppliers (bladeless fan manufacturers) that Dyson would sue those customers and suppliers if they deal with Cornucopia."   (Doc. 1 ¶ 24.)   Cornucopia further claims that —

> Dyson threatens retailers such as Target and Bed, Bath, and Beyond with liability/inconvenience if they sell any competing bladeless fan, such as Cornucopia's.
>
> For example, in April 2011 a Dyson sales representative at the Ace Hardware tradeshow in Chicago, Illinois told a representative of Cornucopia that Dyson would sue if Cornucopia entered the bladeless fan market.
>
> Similarly, a Dyson sales representative told Laura Kerlagon, a representative of Big Wall, that Dyson would pursue litigation if Cornucopia entered the market.
>
> Dyson substantiates its threats of United States enforcement litigation by pointing to its extensive international enforcement activities.
>
> For example, Dyson brought a patent infringement claim in China against a Chinese manufacturer, *Yongkang Yixuan*. Dyson and its outside lawyers publish[ed] the successful

_____

[2] At the preliminary injunction hearing, it became clear that Dyson began selling bladeless fans in the United States in March 2010, rather than October 2009.  The difference is immaterial for present purposes.

1    outcome of that case in order to intimidate those it threatens
2    with United States patent litigation.

3    According to news reports, Dyson brought a similar claim in
4    Korea.

5    In fact, a recent article reports that Dyson is "embroiled in 15
     lawsuits involving copycat bladeless fans."
6
7                                  * * *

8    In approximately July or August 2011, a Cornucopia
     representative travelled to Northern California to meet with a
9    retail buyer for Walmart.

10   Upon seeing a prototype and learning that Cornucopia's
11   bladeless fan was available at a price fitting Walmart's
     buying structure, the Walmart buyer was excited. In fact, he
12   asked Cornucopia's representative to fill out the paperwork
     Walmart requires of its distributors that same day.
13
14   Shortly thereafter, Walmart's Northern California buyer told
     Cornucopia that Walmart was no longer interested.
15
16   Upon information and belief, a more senior Walmart buyer
     from Arkansas told the Northern California buyer that Dyson
17   had threatened to remove Dyson vacuums from Walmart
     stores if Walmart brought in competing bladeless fans.
18
19                                 * * *

20   On information and belief . . . Dyson threatens retailers with
     lawsuits if they stock other bladeless fans like Cornucopia's.
21   Dyson also threatens to withhold its vacuums from retailers if
     they stock competing bladeless fans.
22
23   (*Id.* ¶¶ 39–42, 48–51, 71 (emphasis removed).)   Cornucopia does not say whether

24   Dyson's alleged threats point to any specific patent, or whether Dyson has referred

25   generically to all of its patents relating to bladeless fans.

26        As these allegations imply, Cornucopia sells its fan for less than Dyson sells its

27   corresponding product.  The complaint does not allege Cornucopia's selling price.  It

28

does allege, however, that Dyson sells its product at a much higher price than bladed fans:

> Because consumers that want the safety and performance provided by a bladeless fan are not willing to substitute a standard fan, Dyson's bladeless fans are much more expensive than standard fans.  Standard fans in the United States typically retail at low price; for example, $10.  Dyson's bladeless fan, on the other hand, is much more expensive, retailing for more than $250.

(*Id.* ¶ 18.)

Based on the foregoing, Cornucopia asserts the following claims for relief:

- illegal monopolization (or attempted monopolization) in violation of section 2 of the Sherman Act (15 U.S.C. § 2) and Arizona's antitrust act (A.R.S. §§ 44-1401 to -1416), based on either a *Walker Process* fraud theory or a *PRE* "sham litigation" theory (both discussed in more detail below);

- intentional interference with business expectancy under Arizona common law; and

- declaratory judgment of invalidity or non-infringement of Dyson's patents.

Dyson has now moved to dismiss all claims.  Dyson has also filed its own infringement suit against Cornucopia (CV12-0924), since consolidated with this action.  Dyson's countersuit alleges infringement of the '379 and '166 patents — *i.e.*, the "tilting" and "spacers" patents — as well as two design patents not relevant here.  Dyson has not alleged infringement of the '449 or '111 patents — the "diffuser" and "flexible sealing member" patents.

## IV.    CORNUCOPIA'S MOTION TO DISMISS/MOTION TO STRIKE

Cornucopia has moved to dismiss Dyson's separately-filed-but-since-consolidated infringement action, arguing that it is, in substance, a compulsory counterclaim that should have been filed under Fed. R. Civ. P. 13 in response to Cornucopia's complaint —

rather than as a separate lawsuit. Cornucopia primarily argues that enforcing such a procedural formality will prevent potential res judicata problems:

> At its most basic, Cornucopia's claim is that Dyson is using illegally obtained patents (and related enforcement actions) to monopolize the bladeless fan market. If [Dyson filed its countersuit as a counterclaim and] Cornucopia was awarded judgment [on] that claim, Dyson could not simply file a new infringement action based on some other patent from the same bladeless fan patent estate.

(Doc. 37 at 6–7.)

Dyson responds that it needed to file a separate suit because Dyson Technology owns the patents in question, and Cornucopia had not sued Dyson Technology. More importantly, however, Dyson concedes that consolidating the countersuit converts its separate complaint substantially into a counterclaim:

> As a substantive matter, [Dyson Technology] and Dyson, Inc.'s decision to file a separate lawsuit and immediately seek to consolidate it with the existing case is perfectly consistent with the reasons for the rule governing compulsory counterclaims. Rule 13 aims to prevent multiplicity of litigation and to promptly bring about resolution of disputes before the court. By immediately marking the patent litigation as related to the antitrust case and obtaining a stipulation to consolidation, [Dyson Technology] and Dyson, Inc. achieved those goals.

(Doc. 40 at 9.) At oral argument, counsel for Dyson further stated: "[L]et me be clear on that from our standpoint. . . . [W]e did not assert that [the '449 and '111 patents] were infringed by the current Cornucopia product, and we don't intend to do so." (Doc. 54 at 104.)

Cornucopia's lawsuit plainly puts the '449 and '111 patents in play, including with a request for declaratory judgment of non-infringement. But for the issue of which Dyson entities are the proper defendants, infringement of those patents is an obvious compulsory counterclaim for Dyson. Failure to plead such infringement as a

1   counterclaim would mean that "the claim is waived and the party is precluded by
2   principles of res judicata from raising it again." *Mitchell v. CB Richard Ellis Long Term*
3   *Disability Plan*, 611 F.3d 1192, 1201 (9th Cir. 2010).  Cornucopia's motion therefore
4   seeks to frame this case procedurally such that Dyson can be deemed to have waived any
5   current or future claim against Cornucopia based on the '449 or '111 patents.

6          Given Dyson's concession that filing a separate action and then seeking immediate
7   consolidation effects the purposes of Rule 13, and given Dyson's more explicit
8   concession at oral argument, Cornucopia's motion to dismiss is moot and will be denied
9   as such.  Although Dyson's separate complaint is not formally a counterclaim, the Court
10  treats Dyson's concessions as consent to have its separate complaint treated as if Rule 13
11  applied.  Thus, the Court deems Dyson to have waived any claim against Cornucopia
12  under the '449 or '111 patents as they might relate to the Cornucopia fan at issue in this
13  case, just as if Dyson had filed an answer and counterclaims but omitted any claim based
14  on the '449 or '111 patents.

15         As for Cornucopia's alternative motion to strike, it will likewise be denied.
16  Cornucopia targets certain paragraphs of Dyson's separate complaint that accuse
17  Cornucopia of copying both the substance and the visual details on Dyson's competing
18  fan.  Cornucopia alleges that these allegations have nothing to do with Dyson's patents.
19  However, the allegations may be relevant to Dyson's claim of design patent infringement.
20  They will not be stricken.

21  **V.      ANTITRUST CLAIMS**
22          **A.      *Walker Process***
23                  **1.      Generally**

24         By nature, a patent is a monopoly, and a patent-holder can generally enforce its
25  rights under an unexpired patent without fear of antitrust liability.  *Simpson v. Union Oil*
26  *Co.*, 377 U.S. 13, 24 (1964).  However, in *Walker Process Equipment, Inc. v. Food*
27  *Machinery & Chemical Corp.*, the Supreme Court held that if a patent-holder "obtained
28  [its] patent by knowingly and willfully misrepresenting facts to the Patent Office[, such

behavior] would be sufficient to strip [it] of its exemption from the antitrust laws." 382 U.S. 172, 177 (1965). Later case law permits the plaintiff to make an alternative showing — that, whether or not the patent-holder obtained the patent by fraud, "the infringement suit was a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (internal quotation marks omitted). This alternative showing is a separate theory of relief that, although sometimes conflated with *Walker Process* fraud, is governed by different standards and will be analyzed separately.[3]

Nonetheless, if a plaintiff can make one of these showings, and make a showing of monopolization or attempted monopolization under the Sherman Act, the plaintiff can recover antitrust damages, including treble damages. *Walker Process*, 377 U.S. at 173, 177–78. Federal Circuit law now governs the patent-specific portions of such a claim, while regional circuit law governs the antitrust-specific portion of the claim. *Nobelpharma*, 141 F.3d at 1068.

### 2.    Ripeness of the Claim

A *Walker Process* claim "is typically raised as a counterclaim by a defendant in a patent infringement suit." *Id.* at 1067. This case, by contrast, uses *Walker Process* offensively. Whether Cornucopia can raise this claim offensively is a matter of Federal Circuit law because it overlaps with how a patent-holder may enforce its patents. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1358 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006). Under Federal Circuit law, "the standards . . . developed for determining jurisdiction in a Declaratory Judgment Action of patent invalidity . . . define the minimum level of 'enforcement' necessary to expose the patentee to a[n offensive] *Walker Process* claim . . . ." *Id.* Those standards require a situation in which "a patentee asserts rights under a patent based on certain identified

---

[3] *See* Part V.B, *infra*.

- 17 -

ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007).  For a *Walker Process* claim specifically, however, "[t]hreats of patent litigation against customers, based on a fraudulently-procured patent, with a reasonable likelihood that such threats will cause the customers to cease dealing with their supplier" suffice to bring a claim without waiting to be sued on the patent.  *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1350 (Fed. Cir. 2007).

Cornucopia claims that it has standing to assert an offensive *Walker Process* claim because Dyson has threatened Cornucopia and its customers with patent litigation, but Cornucopia does not say whether Dyson has threatened litigation based on any specific patent.  A fair reading of Cornucopia's complaint, assuming its allegations to be true, suggests Dyson tells retailers that its patent estate covers all bladeless fans.  Yet now that push has come to shove, Dyson accuses Cornucopia of infringing only two of the four relevant patents.

As to those two patents — the '379 ("tilting") and '166 ("spacers") patents — Cornucopia plainly has standing because the threat of an infringement suit based on those patents has become a reality.  Cornucopia's *Walker Process* claim, to the extent it relies on the '379 and '166 patents, is now substantively indistinguishable from a typical *Walker Process* counterclaim.

But it appears to be a question of first impression whether Cornucopia can go forward with a *Walker Process* claim based on the '449 and '111 patents, which Dyson has waived.  Perhaps Dyson might continue to use those patents (as part of its entire bladeless fan patent estate) to threaten Cornucopia's customers and suppliers in its alleged attempt to corner the entire bladeless fan market, and perhaps that "is the kind of economic coercion that the antitrust laws are intended to prevent."  *Hydril*, 474 F.3d at 1350.  However, not surprisingly, the Court could locate no case in which a party brought a *Walker Process* claim based on a patent which the patent-holder chose not to enforce

against the party bringing the claim.  Further, the Federal Circuit has shown special concern for protecting "quiescent patent owners against unwarranted litigation." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988), *overruled on other grounds by MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). Thus, there is no viable *Walker Process* claim as to the '449 and '111 patents.

### 3.      Fraud on the Patent Office

Even if the case were otherwise as to the '449 and '111 patents, Cornucopia's *Walker Process* claim is subject to dismissal as to all four patents for independent reasons.   Cornucopia's *Walker Process* claim fails on the elements of intent and materiality.

### a.      Intent Generally

To establish fraud on the Patent Office, a party asserting a *Walker Process* claim may assert "either a fraudulent misrepresentation or a fraudulent omission," but regardless, there must be clear and convincing "evidence [of] a clear intent to deceive the examiner and thereby cause the PTO to grant an invalid patent."  *Nobelpharma*, 141 F.3d at 1070.  Further, with regard to allegedly fraudulent omissions, "there must be evidence of intent separable from the simple fact of the omission."  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

"Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (internal quotation marks omitted).[4]

---

[4] *Therasense* discusses inequitable conduct, which — before *Therasense* — operated on a similar but looser standard than *Walker Process* fraud.  *Therasense*, however, raised inequitable conduct to match the standard for *Walker Process* claims based on omissions.  *See* George G. Gordon & Stephen A. Stack, *Aligning Antitrust and Patent Law: Side Effects from the Federal Circuit's Cure for the Inequitable Conduct*

Examples of evidence sufficient to show *Walker Process* fraud include deleting references to on-point prior art from a patent application with no adequate explanation, *Nobelpharma*, 141 F.3d at 1062, 1072; failing to include prior art known to the patent applicant through multiple personal demonstrations of that art, *Unitherm*, 375 F.3d at 1360–61; and failing to include a full translation of a foreign patent where that patent "was the only document in the initial application that, if fully understood by the patent examiner, would have resulted in a denial of the application," *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1051 (9th Cir. 2009).

By contrast, *Walker Process* claims have failed on the intent element where the information that allegedly should have been provided to the Patent Office would have been cumulative of what was submitted, and where documents showed that the patent examiner had considered the relevant references, *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1365–67 (Fed. Cir. 1998); or where the omission itself was the only evidence of fraudulent intent, *Dippin' Dots*, 476 F.3d at 1340–41, 1347–48.

### b.    Materiality Generally

In addition to intent, a party claiming *Walker Process* fraud must also make "a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission." *Nobelpharma*, 141 F.3d at 1071.   Materiality is generally established by showing that omitted or misrepresented prior art (or other relevant information) would have required the examiner to reject the application. *See Kaiser Found. Health Plan*, 552 F.3d at 1052 (material omission where foreign patent, if fully understood, disclosed the invention); *Dippin' Dots*, 476 F.3d at 1340 (material omission of evidence of sales made more than one year before the patent priority date, thus implicating 35 U.S.C. § 102(b)'s on-sale bar); *Unitherm*, 375 F.3d at 1361 (material omission that someone else had already invented precisely the same process);

---

"*Plague*" in Therasense, 26 Antitrust 88, 88–90 (Fall 2011).

*Nobelpharma*, 141 F.3d at 1072 (material omission of a book containing on-point prior art).

### c.      No Materiality as to '111, '166, and '379 Patents

Three of Dyson's patents may be easily dispensed with on materiality grounds alone.  The innovations disclosed in the '111, '166, and '379 patents are, respectively, the "flexible sealing member" to improve the impeller's efficiency, "spacers" to reinforce the nozzle, and the ability to tilt while keeping the center of gravity constant.  Cornucopia's complaint contains no allegation that the Japanese patent discloses any such features.  Rather, Cornucopia focuses on the Japanese patent's disclosure of the ability to blow more air than the fan blows purely under its own power by pulling air from behind the ring forward.  But although Dyson includes this effect in each of these patents (either as a dependent claim or a limitation of an independent claim), Cornucopia has offered no reason to believe that understanding the Japanese patent's disclosure of the air-pulling effect would have led the patent examiner to reject the "flexible sealing member," the "spacers," or the ability to tilt without toppling.  Those innovations stand independent of the air-pulling effect.

Further, as to the '166 patent specifically, the file history shows that the patent examiner considered and adequately understood the Japanese patent.   The patent nonetheless eventually issued.

Accordingly, Cornucopia has alleged nothing to support the materiality element of its *Walker Process* claim as to the '111, '166, '379 patents.

### d.      No Intent as to '449 Patent

The international search report included with Dyson's '449 patent application negates any inference that Dyson had a specific intent to deceive the Patent Office by failing to offer a full translation of the Japanese patent.  Cornucopia's theory rests on the notion that Dyson formed some sort of plan to disclose the existence of the Japanese patent but distract the U.S. patent examiners' attention from its relevance.  However, the international search report discusses in English the very issues that Cornucopia believes

1    Dyson attempted to withhold from the Patent Office — and indeed, opines that Dyson's
2    invention is *not* patentable over the Japanese patent (just as Cornucopia believes).
3    Disclosing such a document is not the behavior of a party intending to deflect the Patent
4    Office's attention from the true meaning of the Japanese patent.  Cornucopia's *Walker*
5    *Process* claim therefore fails on the intent element with respect to the '449 patent.

### 4.    Leave to Amend

7         As noted, there is no *Walker Process* claim based on a patent that the patent-
8    holder has chosen not to enforce.  Here, Dyson has waived its right enforce the '449 and
9    '111 patents against Cornucopia's current fan.  Accordingly, leave to amend would be
10   futile as to the '449 and '111 patents.

11        Leave to amend as to the '449 patent is also futile because the file history
12   definitively refutes any inference that Dyson intended to deceive the Patent Office.
13   Leave to amend is similarly futile as to the '166 patent, whose file history shows that the
14   patent examiner considered the Japanese patent, understood it, and nonetheless eventually
15   issued the patent — thus refuting the materiality element of the *Walker Process* claim.

16        This leaves only the '379 "tilting" patent.  As to that patent, Cornucopia offered at
17   oral argument additional language from its translation of the Japanese patent: "The
18   electric fan according to Claim 1 wearing the wind discharge ring is supported in a
19   manner such that the angle of elevation can be adjusted on the base stand."  (Doc. 54 at
20   117.)  This is insufficient to show that the Japanese patent anticipated the invention
21   taught in Dyson's '379 patent, which requires "a center of gravity located so that when
22   the base is located on a substantially horizontal support surface, a projection of the center
23   of gravity on the support surface is within the footprint of the base when the body is in a
24   fully tilted position."  '379 Patent, col. 13, ll. 22–26.  If the Japanese patent disclosed
25   such a feature, it is difficult to understand why Cornucopia would not plead it.

26        Notably, Cornucopia has consistently released only snippets of its translation.  It
27   has not submitted its full translation.  This choice strongly implies that the facts necessary
28   to Cornucopia's claim do not exist.  *See*, *e.g.*, *O'Brien v. DiGrazia*, 544 F.2d 543, 546

(1st Cir. 1976) ("A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim.  But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.").  Nonetheless, the Court does not so conclude at this point.  Cornucopia's *Walker Process* claim as to the '379 patent will be dismissed without prejudice to moving for leave to amend within fourteen days.  *See* Fed. R. Civ. P. 15(a)(2); LRCiv 15.1.[5]

### B.    "Sham" Litigation

"[I]rrespective of the patent applicant's conduct before the PTO, an antitrust claim can also be based on [an] allegation that a suit . . . is subjectively and objectively baseless" — or in other words, that "the infringement suit was a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  *Nobelpharma.*, 141 F.3d at 1068, 1071–72.  This is sometimes referred to as a *PRE* claim, shorthand for *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, in which the Supreme Court affirmed that "sham" litigation is not shielded from the antitrust laws, but tightened the definition of "sham" litigation to require that (1) "the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process* — as opposed to the *outcome* of that process — as an anticompetitive weapon."  508 U.S. 49, 60–61 (1993) (emphasis in original; citations omitted; some alterations incorporated).

Cornucopia asserts that it has stated a claim under this theory based on Dyson's foreign enforcement efforts (mostly in China and Korea), combined with the allegation that "a Dyson representative threatened that Cornucopia would be sued for patent infringement before Dyson had ever seen Cornucopia's product."  (Doc. 38 at 13.)

---

[5] This disposition moots any consideration of Dyson's argument that Cornucopia's *Walker Process* claim does not meet Rule 9(b)'s heightened pleading standard.

Cornucopia here refers to paragraph 40 of its complaint, which states: "[I]n April 2011 a Dyson sales representative at the Ace Hardware tradeshow in Chicago, Illinois told a representative of Cornucopia that Dyson would sue if Cornucopia entered the bladeless fan market."

Cornucopia has not cited, nor could the Court locate, any authority finding "sham" litigation based on foreign enforcement actions. Arguably, one cannot determine whether Dyson's foreign efforts are "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" because those efforts rely on foreign rights under foreign law in a foreign legal system. What might be "objectively baseless" for a litigant suing in the United States on a United States patent might nonetheless be objectively justifiable for the same litigant suing on an otherwise identical patent in a foreign legal system — and vice versa. On the other hand, Cornucopia's complaint admits that at least some of Dyson's foreign enforcement efforts have succeeded, and it is difficult to see how successful foreign litigation could be objectively baseless. Thus, whether or not foreign enforcement efforts could satisfy the "objectively baseless" test, Cornucopia in this case cannot base its *PRE* claim on Dyson's foreign lawsuits.

Dyson's threat to sue "before Dyson had ever seen Cornucopia's product," standing alone, fares no better. Although "sham" threats of litigation against the market competitor can constitute a potential antitrust violation, *see Sosa v. DIRECTV, Inc*., 437 F.3d 923, 938 (9th Cir. 2006); *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1376 (Fed. Cir. 2004), Cornucopia has offered no authority showing that a single threat from a sales representative at a trade show suffices.

However, Cornucopia has also alleged that Dyson repeatedly communicated "sham" threats of litigation to Cornucopia's customers and suppliers in the United States, warning them of liability if they deal with Cornucopia. A few courts have held that threats to a competitor's customers and suppliers can supply the basis for "sham" litigation liability. *See*, *e.g.*, *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367

(5th Cir. 1983); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1200–01 (8th Cir. 1982); *Johnson v. Con-Vey/Keystone, Inc.*, 856 F. Supp. 1443, 1448 (D. Or. 1994); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 460 F. Supp. 1359, 1386 (D. Haw. 1978).  This is a thinly developed area of law, but there is no clear reason why antitrust liability could never apply in such circumstances.  *See* 1 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 205, at 280–82 (3d ed. 2006) (discussing the scenario).  The key element to be proven is, like "sham" litigation itself, that patent-holder acted in bad faith — *i.e.*, that the threat was objectively baseless and subjectively undertaken for the purpose of stifling competition.  *See id*.

In these unique circumstances, however, Cornucopia's claim based on Dyson's threats to customers and suppliers states no claim.   Whatever threats Dyson communicated to others, the Court has now seen Dyson's lawsuit against Cornucopia. Whether or not it is meritorious, it is not objectively baseless, at least as to one of Dyson's design patents.  Accordingly, Cornucopia has failed to state a "sham litigation" claim and it will be dismissed.  This dismissal will be without leave to amend, given the futility of amendment.[6]

## VI.    STATE-LAW INTERFERENCE CLAIM

Dyson challenges Cornucopia's tortious interference claim as preempted. "[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation."  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004).  Thus, "to avoid preemption, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim."  *Id*.

---

[6] This disposition moots any consideration of the parties' arguments about the relevant antitrust market and applies equally to Cornucopia's state-law antitrust claim (Count III).  "Arizona antitrust law is interpreted in accordance with federal law."  *Cal. E. Labs., Inc. v. Gould*, 896 F.2d 400, 403 (9th Cir. 1990); *Brooks Fiber Commc'ns v. GST Tucson Lightwave, Inc.*, 992 F. Supp. 1124, 1130 (D. Ariz. 1997).

(internal quotation marks omitted).  The "bad faith" required for such a claim mirrors the "objectively baseless" prong of the *PRE* test.  *Id.* at 1377.  As noted above, Cornucopia cannot state a claim for such "bad faith."  Accordingly, Cornucopia's state-law tortious interference claim will be dismissed without leave to amend.

## VII.   DECLARATORY JUDGMENT CLAIM

Cornucopia requests a declaration of non-infringement or invalidity of all four Dyson patents.  As explained, Dyson has counterclaimed for infringement on only the '166 and '379 patents (plus two design patents).  Accordingly, Cornucopia's declaratory judgment claim is indisputably ripe as to the '166 and '379 patents.  As to the '449 and '111 patents, Cornucopia's declaratory judgment claim is not mooted as a matter of law by Dyson's election not to enforce those patents.  According to the complaint, Dyson has made generalized threats to retailers about bladeless fans.  Voluntary cessation of challenged conduct does not automatically or usually moot a case.  *Log Cabin Republicans v. United States,* 658 F.3d 1162, 1166–67 (9th Cir. 2011); *Chem. Producers & Distribs. Ass'n v. Helliker,* 463 F.3d 871, 875–78 (9th Cir. 2006).  Cornucopia has therefore stated a controversy sufficient for declaratory relief with respect to the '166 and '379 patents.

IT IS THEREFORE ORDERED that "Cornucopia's 12(b)(6) Motion to Dismiss and Alternative 12(f) Motion to Strike" (Doc. 37) is DENIED.

IT IS FURTHER ORDERED that "Dyson Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and Rule 9(b)" (Doc. 19) is GRANTED IN PART and DENIED IN PART as follows:

    1.  Cornucopia's antitrust claims (Counts I, II, and III) are —

        a.  DISMISSED with prejudice to the extent they assert a *Walker Process* antitrust theory based on Dyson's conduct in obtaining U.S. Patent Nos. 7,931,449, 8,092,166, and/or 7,972,111;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        b.   DISMISSED without prejudice to the extent they assert a *Walker Process* antitrust theory based on Dyson's conduct in obtaining U.S. Patent No. 8,052,379; and

        c.   DISMISSED with prejudice to the extent they assert a "sham litigation" antitrust claim.

    2.   Cornucopia's state-law tortious interference claim (Count IV) is DISMISSED with prejudice.

    3.   Dyson's motion is otherwise DENIED.

IT IS FURTHER ORDERED that any motion for leave to amend as to Cornucopia's *Walker Process* antitrust theory based on Dyson's conduct in obtaining U.S. Patent No. 8,052,379 must be filed by August 10, 2012.

Dated this 27th day of July, 2012.


_____
Neil V. Wake
United States District Judge